Good morning, Your Honors. My name is Tom Davenport. I represent Simus Floor and M&M Installation. Your Honors, this case involves the question of whether or not Simus Floor is an employer under MEPA, the Withdrawal Liability Statute. If Simus is an employer, then it's liable, as an alter ego, then it's liable for M&M's withdrawal liability. If it's not M&M's alter ego, it's not liable for M&M's withdrawal liability. That's the first question. The second question involves whether or not there is a transaction to evade or avoid, which should be disregarded by the court or the pension plan. And as a result, Simus should be found liable for M&M's withdrawal liability. I'll deal with the MEPA question, the Withdrawal Liability question. I'm sorry, the alter ego question first. This Court has 25 years of clear, consistent holdings on the alter ego issue, which find that an alter ego exists if first four factors, the four single employer factors are found, common ownership, common management, common control of labor relations. The fourth one escapes me for the moment. But then ask the question, and this is the issue which is central to this case, then ask the question whether or not the non-union employer was used by the union employer to avoid the union employer's collective bargaining obligations. And the Ninth Circuit has held for since at least 1984 in the Stevens case, and in many cases thereafter, including the most recent case on the subject, Rodin, which was decided last year, that the party who is pursuing the alter ego claim must prove, in addition to the single employer factors, that the non-union employer was used to avoid the union employer's collective bargaining obligations. Let me ask you a question. Far be it for me to suggest that our law hasn't been clear and consistent. But I see also a line of authority from Uridi, or U-A-D, I don't know how it pronounces itself. Which case, I'm sorry? U-R-I-A-T-E. I don't know how it pronounces itself. Okay. Applying the Seymour test, which is sort of a normal alter ego test, in labor law contribution to planned cases. Do you mean the corporate veil-piercing test? Well, a normal corporate alter ego, Seymour test, is applied both here and elsewhere in planned contribution cases. I'm sorry, I'm not familiar with that case. However, I would point out that in NorCal Plumbing, the U-A Local 343 case, the Ninth Circuit specifically held that corporate veil-piercing principles have no place in alter ego analysis under the labor laws, and that, therefore, they wouldn't be applied by the Court. Well, let me just ask you, let me ask you sort of a different question, but it's the same question. In the case that I just mentioned, this circuit said, look, you've got the common, you know, control, common, whatever case, which I take it are admitted in this case. We don't have to deal with them. We do not challenge those. The single employer factors. Right. So then they look to the other two factors of injustice and whether injustice is served by not holding the one liable for the other, and the fraudulent intent, and says, look, when you've got an undercapitalization situation, you satisfy both of those factors. Why doesn't this case turn on the undercapitalization or the lack entirely of capitalization of M&M, which was basically operated as a signless company, and had at the end of the day, no matter whether it stopped doing business because of hard financial times or not, from day one, it didn't have capital sufficient to do anything? It just why doesn't that sort of end the inquiry? Two reasons. Well, actually, there are more, I think. But the two principal reasons are, one, that wasn't even an issue that was raised by the pension plan here, in this case, below. Never raised it. Never argued the alter ego – I'm sorry, the corporate veil-piercing doctrine whatsoever. Well, but my question is, regardless of which doctrine you apply, whether you apply Seymour or whether you apply a two-step question, why doesn't the undercapitalization satisfy the test regardless? Okay. Well, the reason why it doesn't satisfy it under the traditional alter ego test, which is the test that this Court has applied in Stevens and UA 343 and in Rodin and in many, many, many other cases, is because it's not even an issue which is, once you get past the single employer factors, common management, common ownership, centralized control of labor relations, interrelation of operations, once you get past that factor, you have to prove the next factor, which is that the non-union employer was actually used to avoid the collective bargaining obligations of the union employer. And that's the distinguishing thing here. Well, I guess the point here, Audie, in Judge Canvey's opinion, is that if there is undercapitalization or lack of capitalization, that shows that. Shows? Shows that a company, I mean, in this case, M&M, to use the names, it's easier. M&M is totally lacking in capitalization. Well, it operated for 10 years. I understand. By its ---- was able to pay all of its bills, was never, never failed to pay any pension obligations, paid all of its employees. Because Simus made sure it had that kind of cash flow. It was. But had cash flow to do it. Yes. I mean, Simus, Simus, if I understand it, the employees were all commingled. Simus paid for everything. No, there was no commingling of employees at all. Well, that's basically the ---- okay. But the money that it got came from Simus. Well, it was its only customer. Simus was M&M's only customer. But it never made a profit. Well, it made enough of a profit to be able to pay its overheads and to have money in the bank, always had money in the bank. It didn't make a ---- It didn't have anything left over, right? Well, it didn't have any substantial profit. But, Your Honor, how would that change the calculus with respect to the withdrawal liability? If you can infer from that that Simus was, from day one, the employer. Well, I don't think you can infer from that because you wouldn't be applying the alter ego analysis. Why not? Well, even if you go to the more liberal alter ego circuits, the First Circuit in particular, and look at the cases that they apply with a much more liberal alter ego analysis than the Ninth Circuit has ever applied. And we cited this case and discussed it at length in our briefs, AA building erectors. It's the Massachusetts pension funds versus AA building erectors. In that case, which is precisely the same situation as here, virtually word for word identical fact situation, where you had a completely captive labor contractor that was created by a non-union entity so that they could do union work. And they shared their offices. They shared everything. They shared all the administrative staff. It was its only customer. The non-union company was the only customer for the union firm, AA building erectors, in that case. And the First Circuit still held that that wasn't enough to show that there was an alter ego status. So the mere fact that you've got, and this is very common in the construction industry, having in a double-breasted situation to have a captive labor contractor. Well, let me just ask you, as a practical matter, of course, double-breasting goes on all the time. There's nothing unseemly about it. And the rubber only hits the road when one part of it can't meet union trust fund obligations for whatever reason. Or oftentimes it's an attempt to extend, as they put it, as they've argued. Would it, as a practical matter, interfere with, impede, or otherwise call the double-breasting into question if the rule were that the double-breasted company has got, the M&M in this case, has got to be capitalized sufficient to meet its obligations? Well, it was capitalized sufficient to meet its operations while it was operating. It wasn't driven out of business by a lack of capital. It was – it had equipment. Okay. You're answering a fact question. My question was, would it, as a practical matter, that kind of a rule, have any practical effect on double-breasting? Well, I'm not sure I can answer that in the context of double-breasting just for withdrawal liability purposes. Because as you – as we discussed at great length in our briefs, the same rule for double-breasting and alter ego status has to be applied in the withdrawal liability situation, as is applied in the delinquent contribution situation, as is applied in the National Labor Relations Board, when you merely – when you have a union claiming that there's an unlawful double-breast and that, therefore, the other company's employees should be covered by the collective bargaining agreement signed by the union contractor. It's – you have to have the same law apply uniformly, and the Supreme Court's been very clear about this, that the same law has to apply uniformly regardless of the forum in which – in which the issue arises in that particular case. And in fact, when Congress wrote MEPA, when they wrote the Withdrawal Liability Act, they made it very clear that the courts are to apply, when determining whether an employer has an obligation to contribute, are to apply the same general – generally applicable principles of labor relations law as are applied under the National Labor Relations Act. So my answer to your question was that, no, it – you can't make a separate rule for withdrawal liability cases. It has to be the same rule that applies in all cases. And I would submit that the – there – none of the alter ego liability cases that I've read would find that you should turn – that once you've satisfied the single employer factors, that you should then, instead of going any farther, just find that the – that the non-union employer is liable for the union employer's debts simply because of the corporate veil-piercing type of principle or the – that you're raising here. In fact, the Ninth Circuit's been clear that it doesn't want – that it won't do that. Counsel, let me ask you about Ninth Circuit cases. You indicated when you started that there's 25 years of case law to support your position. Were those only collective bargaining cases, or did any of them involve planned contributions? Oh, many of them involved planned contributions. In fact, the key case that we've cited here, which is the UA Local 343 v. NorCal Plumbing case, was a case by trust funds against the two employers, or the two unions. Arguing that they were alter egos. The CMSH case that we cited there. And what was the test applied in that case? That was the same exact test. You find the four factors, the single employer factors, and then the trust funds were required to prove that the non-union company was used to avoid the collective bargaining obligations. And was that at the initiation of this double-breasted – Well, you know, the reverse alter ego kind of a situation. Or was this at the tail end, when the union – the company that had union obligations decided to bail out? That was actually a case where a union employer created a non-union employer, okay? The traditional fact situation you see in an alter ego case. This case, remember, is the exact opposite of that. It's a non-union employer who created a union employer to create – so that they could do union work through the union employer. The other case, though, and this is very important, is the CMSH case. Now, that was actually a withdrawal liability case. And in that case, the trust, the pension fund, sued the non – the – sued two contractors, one of whom had ceased to have a collective bargaining agreement in 1978. The Withdrawal Liability Act was passed in 1980. And then set up – that company set up a second contractor who then signed collective bargaining agreements. And then withdrew from the fund after the passage of the Withdrawal Liability Act. And the question there was, is should the first contractor, since the second contractor couldn't satisfy its obligations to pay the withdrawal liability, should the first contractor be liable for the second contractor's withdrawal liability? And the court, applying these same exact principles, alter ego liability principles, found that no, it couldn't because it didn't have a collective bargaining obligation vis-a-vis the Withdrawal Liability Act when it stopped making – when it ceased to be a union contractor back in 1978. And so they found that that second company couldn't be held as an alter ego to satisfy the obligation of the first company, which was out of business and couldn't pay its – I'm sorry, the withdrawing employer couldn't satisfy its withdrawal liability. So the point – I think that's an important case because it shows that the Ninth Circuit has addressed this issue of whether or not – or how to apply the alter ego liability rules in a withdrawal liability case. And it applied them exactly the same way that it did in a delinquent contribution case, like the NorCal plumbing case, or in a regular, you know, case by a union against two employers trying to impose alter ego liability. Same principles applied exactly. And Rodin is another case, by the way. It's not a – it's the most recent case. It's an attempt by a union to impose alter ego liability. But again, just last year, applying this very same straightforward rule, which has consistently been applied by the court. The – so I think it's important to, you know, to keep in mind that even if, however, you go to the more relaxed standard that some other courts have found, that in this situation, this very strange situation where you've got a non-union employer creating a union employer to create a obligation with a collective bargaining obligation, that in all of those cases that have been addressed by courts around the country, they've always found the way this Court did in Rodin that it doesn't make sense to claim that you've got an alter ego situation under those circumstances because the first company didn't have a collective bargaining obligation when the second company was created so that it would have a collective bargaining agreement. It just doesn't – it's just an illogical, nonsensical kind of an argument to make that that second company was created to avoid a collective bargaining agreement obligation. The other thing is, is that you need to look at – you need to look at the question of alter ego at the – from the standpoint of what the situation was in July of 2004 when M&M withdrew from the pension plan, not from 2008 when M&M happened to be driven out of business by the recession. You need – so you need to look at were they alter egos when the withdrawal took place, not in 2008. You can look at the 2008 issue on the transaction to evade or avoid side of the equation, but not from the alter ego side of the equation. The question – alter ego asks, were M&M and Simus, while M&M had a collective bargaining obligation, were they alter egos? When M&M ceased to have a collective bargaining obligation – The argument would be they were from day one. But the Roden case clearly would find that they were not. Clearly would find. There's never – there's not one iota of evidence that M&M was – that Simus was ever used to avoid M&M's collective bargaining obligation through the day of the withdrawal. Well, here from you, again, because you're way out of time, but we'll give you a little chance to respond. As a – purely as a matter of what you can infer, if M&M were created undercapitalized, you can infer from that avoiding obligations. Well, I don't think – Can't you? Go ahead. I mean, can't you?  Well, first of all, because you're making the assumption that it was created undercapitalized. I don't think it was. I'm not making an assumption. I'm looking at the record. There's nothing in there to show that it wasn't. I mean – Well, it wasn't undercapitalized. Okay. It had equipment. It had employees. It made enough money to pay – It didn't. To pay its employees and to pay all of its overhead. It was never undercapitalized. It always had money in the bank. So I don't agree that it was undercapitalized. Okay. All right. It so happens that did it make the substantial profits that the Simus side of the businesses did? No. But, you know, if M&M had made a profit, you would stand to reason that they would pay those profits out to their shareholders anyway. So it's not as – That's why I asked before, would it change the calculus when it comes to the payment of the withdrawal liability? When we get to 2008, M&M wasn't driven out of business because it didn't have enough money in the bank. It was driven out of business because there was no work to do. The recession took the work away. Well, it's probably a tribal issue on that, at least. Anyway, we'll get back to you. All right. Thank you. Give me another chance for rebuttal. Ms. McDonough. Good morning. May it please the Court. Catherine McDonough for the Appellee Resilient Floor Covering Pension Plan. The alter-ego standard that the district court applied is correct because it is concerned that the district court made up its own standard. I mean, it didn't even – it neither went with a traditional labor law analysis nor with a traditional sort of corporate analysis under Seymour. I mean, the second test it just made up, didn't it? No, Your Honor. I think that standard came from cases in other circuits that have dealt with withdrawal liability, specifically the Hamilton case, Burke v. Hamilton out of Seymour. Well, I guess part of my point in saying it made it up was that we do have, whether they're clear and consistent or not, lines of authority that pertain to contribution, labor contribution issues. And we have a line of authority under Seymour that has a three-factor test. I don't know how different they are actually at the end of the day, but we've got them. And so I'm not sure why we need to go create a third kind of hybrid sort of standard. Do you have any defense for that? Or are you or yourself arguing for a different standard from the one the district court adopted? I don't know for sure. No, I think the standard applied by the district court is correct because we have to look at the purpose of the MPPAA, which is to prevent employers from walking away from pension plans and dumping their pension obligations onto the plan. But how do you get around NorCal? I mean, NorCal was a contribution case. And NorCal applies this, you know, multiple-factor test. It doesn't apply the test that the district court did. How do you get at that? And that's a pretty, I mean, it's not that old, 95. How do you get around that case? Yes, Your Honor. Well, the U.S. 343 case had to do with a union seeking to bind a nonsignatory to a collective bargaining agreement. But it had to do with contributions to a health and welfare fund. Right. I understand that. But it was seeking to bind a nonsignatory to a collective bargaining agreement. And it was seeking future contributions under that collective bargaining agreement. The union was seeking contributions on behalf of the nonsignatory's employees. This is a different case. We are not the pension fund is not seeking to turn Simus into a union shop. It's not seeking contributions on behalf of Simus employees. I'm having a hard time with why that distinction makes a difference. I mean, unless you think that Congress was more interested in protecting pension funds than it was in protecting health and welfare funds, which I think would be a pretty hard sell, I don't understand why the distinction between the two makes a difference. Because this was an accrued pension obligation that was earned by M&M employees in service of Simus customers for the profit of Simus shareholders. And if there weren't a finding of employer status here, it would mean that that accrued obligation would be, instead of being paid for by the entity that profited from the work, it would be dumped onto the other employers in the pension plan and possibly onto the PBGC, the agency that insures those benefits. Okay. Let me follow up on that. I understand the difference between ongoing obligation in the usually in a successive employer contracting kind of situation where you've got an active CBA and you've got a CBA obligation to the union that you think out on and arguably transfer business to yourself that doesn't become burdened with a CBA obligation. I understand the difference between that scenario and this one, where you have withdrawal liability that is more in the nature of a debt. Correct. I mean, the union is not seeking to hold Simus to M&M's employees. It's trying to get its debt. Correct. And that's the difference. But is there any case that supports you in making that distinction? And why does that distinction argue in favor of one set of factors to consider on alter ego rather than another? Well, I think, again, we just have to look to the purpose of the act. And the legislative history holds that in defining employer, courts should look to the purpose of the act. And the purpose of the act was to prevent employers from dumping their pension obligations onto the other employers in the plan. Well, of course, I... Okay. Go ahead. And so that's why this accrued obligation is different. Because, again, this was earned during a 10-year period where M&M employees were working exclusively for Simus Floor customers to the profit of Simus Floor shareholders. Okay. Now, this may be a really dumb question. I mean, it's contrasted with the rest of them, which are merely stupid. But why is it, if your characterization is correct, that it's more like it's an accrued obligation, it's a dead obligation, basically? It's a done deal. Why didn't you just sue M&M for that, get a judgment, and then seek to enforce the judgment against Simus, instead of trying to shoehorn Simus into the definition of the act? Because Simus is the entity that directed the work of these employees. These employees only ever served Simus customers only for the profit of Simus shareholders. And for that reason, Simus is an employer. And that's basically what the essence of our claim against Simus under the MPPAA was. So you're saying that it was from day one, the employer, or that it morphed into being? Well, I think the essence of our claim here is that to respect the corporate form now, for purposes of withdrawal liability, when M&M and Simus Floor themselves never respected corporate formalities, would mean that the operation that M&M and Simus Floor undertook, would mean that M&M and Simus Floor would be subject to the same obligations for that work onto the plan. Is it your answer to Judge Reimer's question that you could not have sued M&M? Could not have sued M&M? Yes. For the failure to pay what they owe the fund. No. We did have a claim against M&M, obviously. But again... And Judge Reimer asked you, why didn't you sue them? We brought the claim against M&M and Simus. But again, Simus is the entity that profited off the work of these employees. And these employees worked exclusively for their customers. And as Judge Reimer pointed out, when Mr. Davenport was arguing, M&M never had sufficient assets or income of its own to pay its own pension obligations. And so... It did until 2004, didn't it? Yes, but all of those funds were received from Simus. Yes. So Simon capitalized M&M to pay what it owed the fund. Yes, but M&M would never have sufficient funds to pay its own pension obligations unless it received that money from Simus Floor. It had no equipment, no assets, no income stream. And on that point, I wanted to return to the CMSH case that Mr. Davenport cited. In that case, it's important to note that there were no joint operations between the two entities. And they served 90% separate customers. And the framing entity paid its own pension obligations with its own money that it received from its own customers. And so, in this situation, it's completely different because, again, M&M had no source to pay its own pension obligations unless it received that money from Simus. And so that's a basis for distinguishing the CMSH case. And I also wanted to point out with the CMSH case that the district court correctly distinguished it because it dealt with really applying retroactively withdrawal liability to an employer that withdrew two years before the act was even enacted. So, really, the essence of that case is the employer withdrew two years before the act was even enacted and from that point forward, there were no joint operations. So, really, it's just, look, if you withdraw in 1978, two years before the act is even enacted, and then from that point forward, you never have joint operations with the signatory, well, of course you're not an alter ego. And that was really the essence of that case. And the district court correctly distinguished it on that basis. Okay. As this has kind of been posed by both sides, it appears that they're arguing for a two-factor traditional labor law test. You're arguing for a three-factor C-more test. Does it — does the outcome of the appeal turn on which test is adopted? Well, Your Honor, if the UA343 standard or the Rodin standard were applied, then we'd have to look to whether there was some intent in using the non-signatory to evade the collective bargaining — evade collective bargaining obligations. So in that case, there would have to be a review about whether there was intent. Okay. And you're the expert. What — and I don't mean to be asking you to argue against yourself. My question is simply one for information. What evidence would manifest that kind of intent? Well, I think we have it here on this record where the principles of Simas discussed extensively shutting down M&M to avoid its collective bargaining obligations, reassigning its work to avoid its withdrawal liability. So that type of evidence that we have in the record is what we would look at under a UA343-type standard. So if that was the standard, would the case then have to go back to the district court to reassess it under that standard? Well, I think we also have to look at the fact that there was a transaction to evade or avoid claim. That's the next issue, in other words. Right. Right. So with the transaction to evade or avoid claim, courts have said that even mixed motive is sufficient to constitute a transaction to evade. So in other words — As long as it's one of the purposes, in other words. Right. Right. So I think if we start looking at an intent-type standard, then we start getting into the transaction to evade or avoid. And in those cases, a mixed motive would be sufficient. Okay. So let me ask my question then about that. So if you then hop over to the transaction to evade or avoid, which is an issue the district court didn't address because it didn't get there, would the case have to go back then because there's issues of fact or? I think the evidence is sufficient on this record because, again, there's testimony from the Simas floor principals about how they could do exactly what they did here, which is reassign M&M's work to evade withdrawal liability. So under the transaction to evade or avoid, considering that it's a mixed motive and also it's important to note that the employer actually has the burden of proof under the transaction to evade or avoid claim. They have to prove that it wasn't, in other words? Yes. Okay. Yes. So considering that the employer has the burden of proof and that even in a mixed motive case, there can be a ruling that the transaction was a transaction to evade or avoid, that the employer could be granted a summary judgment in favor of the plan? Thank you. Thank you. Okay. Thank you, Mr. McDonough. I'll give you just a little bit of time. I appreciate that. Since the most recent thing she talked about is the transaction to evade or avoid, I'd like to address that quickly. First of all, the employer does not have the burden of proof on that. The burden of proof issue that she raised is if you are in arbitration, there's a presumption of correctness about fact determinations, but the concrete pipe case that we cited to you from the Supreme Court specifically says that first of all, that it only applies to arbitration cases. Number two, that that only applies to fact determinations. There are no fact determinations here because we have an undisputed evidence record. And also, the question here, transaction to evade or avoid, is a mixed question of fact or law. So they have the burden on that. Number two, because I know I have very little time, so I'll try and go really quickly. The question of intent. What they point to as intent are statements or testimony that was given in the malpractice case against the, well, you're aware of that, where what the Simas principles testified to is that they concluded they couldn't avoid paying a withdrawal liability by merely closing down M&M. That that withdrawal liability would follow them to Simas. So the actual evidence is proof that they didn't have an intent when they closed M&M to avoid their withdrawal liability because they believe, wrongly I think, that's why we're here arguing, that they believe that that liability would fall into Simas anyway. So there's no evidence in this record, none, zero, that they closed M&M to avoid paying the withdrawal liability. The only evidence, and the only evidence here is Mark Simas' declaration. The only evidence about the reason for closing was that they were run out of business by the economy. That's it. And they just simply had no more work to perform. The, Ms. McDonough says that you have to look to the purposes of MEPA, the Act itself, to define who is an employer under the Act. And the principle question is here, here is whether Simas is an employer. But that's not true. All of the courts that have addressed the question of who is an employer under MEPA have concluded that you have to, that you're an employer if you had an obligation to contribute to the pension plan. Not, it's not based upon the principle, the purposes behind MEPA. The other thing that's important to note is that MEPA and ERISA have the exact same purpose. The Supreme Court has said this numerous times. The purpose is to protect pension plan benefits for participants. The same exact purpose is for MEPA and ERISA. And, by the way, the NorCal case that you brought up, Judge Kennelly, was not just a health and welfare trust fund case. It was a pension trust fund case. It was all of the various trust funds under that particular collective bargaining agreement were suing to, were suing the alter ego to try and prove that the alter ego had an obligation to pay pension and health and welfare and apprenticeship and all different types of trust benefits. If you've got one more point, please make it. One more point. This is it. In NorCal, when the Ninth Circuit discussed, said that corporate veil piercing principles don't apply, they also said that every corporate veil piercing case includes an element of fraud, proof of fraud. In this situation, M&M was, the relationship between Simus and M&M was known to the unions and to the pension fund throughout the 10 years that they had a collective bargaining agreement. Their close relationship. There's no element of fraud here. The union knew exactly what it was getting into when they signed a contract with M&M, and they got the benefit of their bargain. Thank you very much. Thank you, Mr. Davenport. I know that I, my colleagues would join me in this, but thank you both for a helpful discussion on this. It's an interesting and not easy issue, and we appreciate your help. Both of you. Thank you. Thank you. The matter just argued will be submitted, and we'll take a brief recess before hearing the last case on the calendar.
judges: Kennelly, Alarcon, Rymer